NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**MYMAIL, LTD.,**
*Plaintiff-Appellant*

**v.**

**OOVOO, LLC,**
*Defendant-Appellee*

---

2020-1825

---

Appeal from the United States District Court for the Northern District of California in No. 5:17-cv-04487-LHK, Judge Lucy H. Koh.

--------------------------------------------------

**MYMAIL, LTD.,**
*Plaintiff-Appellant*

**v.**

**IAC SEARCH & MEDIA, INC.,**
*Defendant-Appellee*

---

2020-1826

---

Appeal from the United States District Court for the Northern District of California in No. 5:17-cv-04488-LHK, Judge Lucy H. Koh.

————————————————

Decided: August 19, 2021

————————————————

ERIC WILLIAM BUETHER, Buether Joe & Counselors, LLC, Dallas, TX, for plaintiff-appellant. Also represented by THERESA DAWSON.

ROBERT LOUIS HAILS, JR., Baker & Hostetler LLP, Washington, DC, for defendants-appellees. Also represented by CASSANDRA SIMMONS, T. CY WALKER.

————————————————

Before MOORE, *Chief Judge*, O'MALLEY and REYNA, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

MyMail, Ltd. appeals from a pair of identical decisions of the United States District Court for the Northern District of California granting ooVoo, LLC's and IAC Search & Media, Inc.'s renewed motions for judgment on the pleadings. In a prior appeal, this court vacated the district court's judgments on the pleadings and remanded because the district court failed to address the parties' claim construction dispute before considering the eligibility of MyMail's patent claims under 35 U.S.C. § 101. *MyMail, Ltd. v. ooVoo, LLC* (*MyMail I*), 934 F.3d 1373, 1381 (Fed. Cir. 2019). On remand, the district court construed the disputed term, "toolbar." Under this construction, the court again held that the claims of MyMail's patents are ineligible. *MyMail, Ltd. v. ooVoo, LLC* (*MyMail II*), Nos. 17-cv-04487-LHK, 17-cv-04488-LHK, 2020 WL 2219036, at *22 (N.D. Cal. May 7, 2020). For the reasons explained below, we *affirm* as to both decisions.

## I. BACKGROUND

### A. The Asserted Patents

The two asserted patents—U.S. Patent Nos. 8,275,863 ("the '863 patent") and 9,021,070 ("the '070 patent")—have virtually identical written descriptions. The '863 patent is entitled "Method of Modifying a Toolbar," and the '070 patent is entitled "Dynamically Modifying a Toolbar." '863 patent, at [54]; '070 patent, at [54]. The patents describe the field of invention as relating generally to digital data networks and more particularly to "network access and to minimizing unauthorized interception of data and denial of network services." *E.g.*, '863 patent, col. 1, ll. 26–29. They further describe the present invention as a method of and apparatus for (a) simplifying the process of access to a network, (b) dividing the responsibility of servicing a user wanting to access the network, and (c) minimizing the possibility of improper dissemination of email header data, as well as the possibility of improper use of network resources. *See, e.g.*, *id.* at col. 3, ll. 44–50.

The written descriptions describe a user—*e.g.*, a computer system—that includes a client dispatch application. *E.g.*, *id.* at col. 9, ll. 2–3. The client dispatch application communicates with an access service by transmitting user information and receiving access information for a particular Internet Service Provider ("ISP"). *See, e.g.*, *id.* at col. 7, l. 24–col. 8, l. 3. The client dispatch application may then connect to that ISP. *E.g.*, *id.* at col. 8, ll. 4–16.

In addition to the client dispatch application, the user includes several databases for storing information, including a button bar database. *E.g.*, *id.* at col. 9, ll. 20–23. The button bar database includes information related to creating and modifying a button bar—*i.e.*, a toolbar. *E.g.*, *id.* at col. 10, ll. 7–9. The toolbar is a human interface through which numerous functions may be initiated. *E.g.*, *id.* According to the written descriptions, the toolbar "has some unique properties as it can be dynamically changed or

updated via a Pinger process or a MOT script." *E.g.*, *id.* at col. 10, ll. 15–17.

The written descriptions explain that the Pinger is a process through which all communications between the client dispatch application and the access service take place.[1] *E.g.*, *id.* at col. 11, ll. 53–55. According to the process, the client dispatch application initiates a pinger, or pinger message, with header information. *E.g.*, *id.* at col. 11, ll. 44–52; col. 12, ll. 16–24. The header information includes the current user ID, the account owner ID, PAP ID, the current IP address assigned to the user, Group ID, the user's current time, database revisions levels, and the revision levels of the client dispatch application and other related software. *E.g.*, *id.* With this information, the access service can determine if a user needs a database or file update. *E.g.*, *id.* at col. 12, ll. 25–28. In this way, the pinger process "allows the client dispatch application and the access service to interact and download database updates (or other information) to the user." *E.g.*, *id.* at col. 12, ll. 33–36.

The patents describe MOT script in several ways. MOT is not "an acronym for anything meaningful." *E.g.*, *id.* at col. 12, ll. 50–51. It merely refers to the script language used by the Pinger process and elsewhere in the patents. *E.g.*, *id.* at col. 12, ll. 48–50. And, according to the written descriptions, "[a]s will be appreciated, a MOT script defines how to build a button bar using the button bar database [ ] and its database entries." *E.g.*, *id.* at col. 11, ll. 5–7. The client dispatch application can use the MOT script and button bar database information to build the toolbar

---

[1]    The written descriptions also describe the Pinger process as comprising "an entity that acts transparently as a 'services' coordinator," which provides services, including "[u]pdate services that can perform client software, database, and maintenance services during periods of inactivity." '863 patent, col. 10, ll. 17–29.

automatically according to the specifications of the MOT script. *E.g.*, *id.* at col. 11, ll. 10–13. The written descriptions also identify MOT script as a way to provide updates to databases. *E.g.*, *id.* at col. 12, ll. 36–47. The access service may provide the client dispatch application with MOT script and other data through a web page site, an email message, a file transfer procedure site, or other similar networking storage and transport mechanisms. *E.g.*, *id.*

Claim 1 of the '863 patent and claim 1 of the '070 patent are representative. Claim 1 of the '863 patent recites:

1. A method of modifying a toolbar, comprising the steps of:

a user Internet device displaying a toolbar comprising one or more buttons, the toolbar defined by toolbar data stored in one or more toolbar-defining databases, the toolbar data comprising a plurality of attributes, each attribute associated with a button of the toolbar, wherein for each button of the toolbar, at least one of the plurality of attributes identifying a function to be performed when the button is actuated by the user Internet device;

the user Internet device automatically sending a revision level of the one or more toolbar-defining databases to a predetermined network address;

a server at the predetermined network address determining, from the revision level, the user Internet device should receive the toolbar update data;

the user Internet device receiving toolbar update data from the Internet;

the user Internet device initiating without user interaction an operation to update the toolbar data in accordance with the toolbar update data received;

the user Internet device updating, by the operation, the toolbar data in accordance with the

toolbar update data, thereby producing updated toolbar data, the updating comprising at least one of the following steps (a) and (b), each respectively comprising:

> (a) writing at least one new attribute to the original toolbar data, wherein the writing at least one new attribute to the toolbar data comprises changing the one or more buttons of the toolbar by adding a button; and

> (b) updating at least one attribute of the toolbar data; and

the user Internet device displaying the toolbar as defined by the updated toolbar data.

*Id.* at col. 29, ll. 27–62.

Claim 1 of the '070 patent is similar. It, however, recites a method for "dynamically" modifying a toolbar. *See* '070 patent, col. 29, ll. 40–41. It also claims "information associated with the one or more toolbar-defining databases" instead of a revision level, "wherein the information associated with the toolbar data includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number." *See id.* at col. 29, l. 40–col. 30, l. 20.

## B.  Procedural History

MyMail separately sued ooVoo and IAC for infringement of claims 1–5, 9–13, 16–17, 19–20, and 23 of the '863 patent and claims 1–13 and 15–22 of the '070 patent. On March 16, 2018, without construing any debated claim terms or assuming MyMail's construction of those terms to

be accurate, the district court granted ooVoo and IAC's motions for judgment on the pleadings, holding that MyMail's patent claims were ineligible under 35 U.S.C. § 101. On appeal, the parties strenuously debated the meaning of the term "toolbar" in the representative claims, largely predicating their § 101 debate on the meaning of that term. We declined to interpret the term in the first instance. We also declined ooVoo and IAC's alternative invitation to assess patent eligibility under MyMail's proposed construction in the first instance. Because the record before us was not yet ripe for appellate review, we vacated and remanded for the district court to construe the disputed term in the first instance and to reassess whether the asserted claims recite ineligible subject matter. *MyMail I*, 934 F.3d at 1380.

On remand, the district court construed the term "toolbar" to mean "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script." *MyMail, Ltd. v. IAC Search & Media, Inc.*, No. 17-cv-04488-LHK, 2020 WL 1043659, at *1 (N.D. Cal. Mar. 4, 2020). The court explained that its construction imposed a meaningful limitation on the claims. *Id.* at *11. Although the construction does not require that the toolbar be dynamically changed or updated by a Pinger process or MOT script, the toolbar must have such a capability, "regardless of whether the toolbar can be dynamically changed or updated by other means." *Id.*

Despite accepting MyMail's construction of the disputed term, the district court granted the defendants' renewed motions for judgment on the pleadings on May 7, 2020. *MyMail II*, 2020 WL 2219036, at *22. It analyzed the two representative claims together because of their substantially similar wording and the patents' nearly identical written descriptions. *Id.* at *9.

At Step One of the *Alice* framework, the court held that, even in light of its construction of "toolbar," the claims are directed to the abstract idea of updating toolbar software

over a network without user intervention. *Id.* at *10–17. It reviewed the written descriptions' disclosures on the Pinger process and the MOT script, concluding that their functions are nearly identical to the steps recited in the representative claims. *See id.* at *11–13. The court found MyMail's arguments on the Pinger process and the MOT script to be vague and conclusory because MyMail failed to identify a specific improvement in computer functionality or a problem in the prior art that the claims solve. *See id.* at *15–16. The court added that MyMail failed to explain how the toolbar, as construed, improves the toolbar update process. *Id.* at *15.

At Step Two of the *Alice* framework, the district court found that all components of the claims, including the Pinger process and MOT script, are generic and function in a conventional manner. *Id.* at *17–19. The district court further found that the toolbar's ability to be dynamically changed or updated via a Pinger process or a MOT script did not provide an inventive concept because it merely implements the abstract idea. *Id.* at *19. Although MyMail made no arguments about the ordered combination of claim elements, the district court found no inventive concept in the combination. *Id.* at *19. The court concluded that there was no disputed issue of fact to preclude dismissal. It also rejected MyMail's argument that the denials of institution and the patentability determination of the Patent Trial and Appeal Board ("Board") were relevant to patent eligibility.[2] *Id.* at *20–22.

---

[2]    In an inter partes review for which a third party petitioned, the Board upheld the patentability of claims of the '863 patent because none of the cited prior art disclosed the use of a Pinger process or MOT script to update a toolbar. For the same reason, the Board denied IAC's two petitions for review of claims of the '863 patent and the '070 patent, respectively.

MyMail timely appealed.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

We review a grant of judgment on the pleadings under the law of the regional circuit.  *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1293 (Fed. Cir. 2016).  The Ninth Circuit reviews a grant of judgment on the pleadings de novo.  *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1246 (9th Cir. 2017).  Judgment on the pleadings is proper when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

Patent-eligibility is a question of law with underlying factual issues.  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018).  We review the ultimate issue of law de novo.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

Under § 101, the scope of patentable subject matter encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  Section 101, however, has an important implicit exception that laws of nature, natural phenomena, and abstract ideas are not patent eligible.  *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  We follow the Supreme Court's two-step *Alice* framework for determining patent eligibility.  *Id.* at 217.  At Step One, we determine whether the claims at issue are directed to an ineligible law of nature, natural phenomenon, or abstract idea.  *Id.*  If so, we proceed to Step Two, considering the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application.  *Id.*  This second step is often

described as a search for an inventive concept. *Id.* at 217–18.

## A.  Step One

We hold that claim 1 of the '863 patent and claim 1 of the '070 patent are directed to the ineligible concept of updating toolbar software over a network without user intervention.[3]  At Step One, we look at the "focus of the claimed advance over the prior art" to determine if the claim's "character as a whole" is directed to excluded subject matter. *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016).  In cases involving software innovations, this inquiry often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies as an abstract idea for which computers are invoked merely as a tool. *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306–07 (Fed. Cir. 2020).

We have long "treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).  We have similarly treated analyzing information by steps that people perform mentally, or by mathematical algorithms, without more, as mental processes falling within the abstract-idea category. *Id.* at 1354.  And "merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract." *Id.*

---

[3]    We reject the appellees' contention that the district court misconstrued the term "toolbar."  Given our conclusion that the asserted claims are ineligible under that construction, we see no need to discuss the district court's thoughtful claim construction.

Here, the representative claims are directed to updating toolbar software over a network without user intervention. This amounts to no more than invoking computers as a tool to perform the abstract ideas of collecting information, analyzing information, and presenting the results of the analysis in the software update context. For example, the representative claims recite collecting information by sending "a revision level of the one or more toolbar-defining databases" or "information associated with the one or more toolbar-defining databases" from a user device to a server. '863 patent, col. 29, ll. 39–41; '070 patent, col. 29, ll. 55–56. They further recite analyzing information by, at the server, determining from the collected information whether the user device should receive toolbar update data. '863 patent, col. 29, ll. 42–44; '070 patent, col. 29, ll. 57–59. And they recite presenting the results by, at the user device, receiving the toolbar update data, updating the toolbar automatically, and displaying the updated toolbar. '863 patent, col. 29, ll. 45–62; '070 patent, col. 29, l. 60–col. 30, l. 11.

Despite MyMail's contention otherwise, both in the earlier appeal and here, the district court's construction of the term "toolbar" to require the capability of being updated by a Pinger process or a MOT script does not rescue the representative claims from abstraction. Their character as a whole remains directed to updating toolbar software over a network without user intervention.

The written descriptions make clear that updating via the Pinger process is no different than updating via the steps of the claimed method, which is directed to an abstract idea. According to the written descriptions, the Pinger process is the process by which a client dispatch application and an access service communicate. *E.g.*, '863 patent, col. 11, ll. 53–55. To update via this process, (1) the client dispatch application transmits information, including revision level, to the access service; (2) the access service determines whether the client dispatch application

needs a database update; and (3) the client dispatch application downloads any database updates. *See, e.g.*, '863 patent, col. 12, ll. 16–36. We see nothing in the written descriptions or MyMail's arguments on appeal persuading us that updating via the Pinger process is a specific method or implementation of updating toolbar software. In view of the patents' disclosures, the Pinger process does not change the character of the claims as a whole.

Similarly, the MOT script does not change the claims' character as a whole. According to the written descriptions, MOT script refers to the unspecified script language used by the Pinger process and elsewhere in the patents. *E.g.*, *id.* at col. 12, ll. 48–50. The only other disclosures about MOT script relate to its functions of (a) permitting the client dispatch application to build a toolbar automatically and (b) providing the client dispatch application with database updates. *See, e.g.*, *id.* at col. 11, ll. 5–13; col. 12, ll. 33–47. That the claimed toolbar can be updated via a MOT script does not change the claims' focus on the abstract idea of updating toolbar software over a network without user intervention.

MyMail argues that its claims are instead directed to an improvement in the functionality of the software updating process. According to MyMail, its new and specific method of updating software via a Pinger process or a MOT script improves the functionality of updating software "by allowing the toolbar to be updated via the [P]inger process or MOT script method." Appellant's Br. at 30; *accord, e.g.*, *id.* at 31–32. MyMail contends that the district court overgeneralized its claims by ignoring the Pinger process and MOT script methods for updating and modifying a toolbar.

MyMail's arguments are unpersuasive. The written descriptions provide no support for MyMail's purported improvement in computer functionality. As noted, updating via the Pinger process proceeds exactly as the claimed method of updating, which is abstract: the user device

transmits information to the server; the server determines whether the user device needs an update; and the user device receives update data, updates the toolbar, and displays the updated toolbar. And the MOT script is merely a language that the Pinger process uses. The Pinger process and MOT script therefore do little more than describe the abstract idea of updating software over a network without user intervention. We see nothing in the specification suggesting that the Pinger process or MOT script improved prior art processes.

MyMail also never explains how updating via the Pinger process or MOT script improves computer functionality. At most, MyMail asserts that its claims improve computer functionality by enabling updating via a Pinger process or MOT script. Such conclusory statements, however, fail to provide the level of detail our case law requires to establish an improvement in computer functionality. *Compare* Appellant's Br. 30–35 (arguing that the claimed toolbar's capacity to be updated via the Pinger process or MOT script improves computer functionality by allowing toolbars to be updated via the Pinger process or MOT script), *with, e.g., Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019) (holding that a limitation requiring modification of a permutation to data "in time" improved the function of error detection systems to detect systemic errors), *and Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1348–49 (Fed. Cir. 2017) (holding that a particular configuration of sensors improved the accuracy of calculating the position and orientation of an object on a moving platform). In sum, without more, we are unpersuaded by MyMail's bare and rote assertions that a claimed capability improves computer functionality by enabling that capability.

Because MyMail's claims are directed to abstract ideas, we turn to Step Two of *Alice*.[4]

## B.  Step Two

We find no inventive concept sufficient to transform the nature of the claims into a patent-eligible application. At Step Two, the inventive concept must be significantly more than the abstract idea itself.  *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).  It cannot simply be an instruction to implement or apply the abstract idea on a computer.  *Id.*  The inventive concept must also be more than well-understood, routine, or conventional activity.  *Affinity Labs*, 838 F.3d at 1262.

Here, the individual claim elements are either generic computer components or routine activity.  For example, the representative claims recite "a user Internet device" and "a server," which are no more than a generic computer and server, respectively.  *See* '863 patent, col. 29, ll. 30, 41; '070 patent, col. 29, ll. 42, 55.  These components perform routine functions, like "displaying a toolbar comprising one or more buttons," "sending a revision level" from the device to the server, "determining" at the server whether the device needs an update, "receiving" at the device "toolbar update data," and "initiating" at the device "an operation to update the toolbar data."  *See* '863 patent, col. 29, ll. 30–31, 38–39,

---

[4]    In reply, MyMail also argues that the purported claimed advance—providing a toolbar capable of being updated dynamically via the Pinger process or MOT script—solves a prior art problem by "[e]liminat[ing] the need for a computer user to configure and reconfigure computer networking software for network access through a multiplicity of ISPs and Network Access Providers."  *E.g.*, '863 patent, col. 4, ll. 58–61.  We see no support in the written descriptions for MyMail's attorney argument.

41–49; *see also* '070 patent, col. 29, ll. 42–43, 55–65. These conventional steps, specified at a high level of generality, are insufficient to supply an inventive concept. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014).

Even when viewing the claim elements as an ordered combination, we discern no inventive concept in the process of sending information from a user device to a server, determining at the server whether the user device should receive toolbar update data, receiving at the user device the update data, updating the toolbar, and displaying the toolbar.

We also see no inventive concept arising from the district court's construction of the term "toolbar." As noted previously, the Pinger process and MOT script merely describe the abstract claimed process. Therefore, the representative claims' use of the Pinger process and MOT script cannot supply the necessary inventive concept. *See BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept.").

We are unpersuaded by MyMail's arguments to the contrary. First, MyMail argues that its claims are directed at improving the functionality of a toolbar by providing "a specific 'pinger process' as a means to update the toolbar data display dynamically and automatically without user intervention." Appellant's Br. 39–40. Relatedly, MyMail contends that the Pinger process confines the scope of its claims to a specific application of the concept of updating toolbar data. As with MyMail's corresponding Step One arguments, the written description undercuts MyMail's characterization of the Pinger process as a specific way of updating toolbar data without user intervention.

Second, MyMail relies heavily on the Board's denials of institution and the Board's final written decision of

patentability.  According to MyMail, it was legally incorrect for the district court to declare the Board's findings irrelevant.  Instead, "[a]t a minimum, the [Board] decisions show that there is a plausible basis for MyMail's contention that the Pinger process/MOT script method was or was not a well-understood, routine and conventional method at the time of the invention of the MyMail Patents."  *Id.* at 41.

In *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138 (Fed. Cir. 2016), we rejected a similar prior-art based argument as a misstatement of the law.  While "the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap," we explained that the search for an inventive concept is distinct from demonstrating novelty.  *Id.* at 1151 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 90 (2012)).  Indeed, "a claim for a *new* abstract idea is still an abstract idea."[5] *Id.*  Here, the Board's decisions do not supply an inventive concept, where there is none in the representative claims.  Nor do they create a genuine factual dispute over whether updating via the Pinger process or MOT script was well-understood, routine, or conventional.  This is because, as noted, the Pinger process and MOT script merely describe the abstract idea itself.

Finally, MyMail argues that judgment on the pleadings is inappropriate here, where the written descriptions characterize the claimed toolbar's capability of updating via a Pinger process or a MOT script as "unique properties."  *See, e.g.*, '863 patent, col. 10, ll. 15–17.  We disagree.  The characterization of updating via a Pinger process or MOT script

---

[5]     Our case law has used the word "new" in both the novelty and patent-eligibility contexts.  We, however, have never subsumed novelty (or nonobviousness) into patent eligibility.  Rather, our use of "new" to describe patent-eligible claims harkens back to the "new and useful" language in § 101.

as unique does not demand a different conclusion on eligibility. The Pinger process and MOT script merely describe the abstract idea itself. For these reasons, we hold that the representative claims are ineligible under § 101.

### III. CONCLUSION

We have considered MyMail's remaining arguments and find them to be without merit. Because the district court properly granted the appellees judgment on the pleadings, we *affirm*.

**AFFIRMED**